ALEXANDER S., Alfred S., Benny B., Christopher M., Lafayette M., and Ricky S., By and Through their Guardian ad Litem, Lesly A. BOWERS, individually and as representatives of a class of juveniles, Plaintiffs,

v.

Flora Brooks BOYD, individually and in her capacity as Director of the Department of Juvenile Justice; Richard E. McLawhorn, individually and in his official capacity as former Commissioner of the Department of Juvenile Justice for the State of South Carolina; John F. Henry, Frank Mauldin, Kathleen P. Jennings, Joseph W. Hudgens, Karole Jensen and J.P. Neal, individually and in their official capacities as former Board Members for the South Carolina Department of Juvenile Justice, Defendants.

Civil Action No. 3:90–3062–17.

United States District Court, D. South Carolina, Columbia Division.

Nov. 22, 1995.

---

W. Gaston Fairey, Rochelle Lyn Romosca, Fairey, Parise & Mills, P.A., Columbia, South Carolina, Robert O. Meriwether, Alice V. Harris, William S. Brown, M. Clifton Scott, Nelson, Mullins, Riley & Scarborough, Columbia, South Carolina, Nancy C. McCormick, Holly C. Walker, South Carolina Protection and Advocacy System for the Handicapped, Inc., Columbia, South Carolina, for plaintiffs.

Edward M. Woodward, Frances G. Smith, Woodward, Levintis, Unger, Daves, Herndon & Cothran, Columbia, South Carolina, Vinton D. Lide, Lide, Montgomery & Potts, Columbia, South Carolina, Larry L. Vanderbilt, South Carolina Department of Juvenile Justice, Columbia, South Carolina, for defendants.

Richard A. Harpootlian, A. Randolph Hough, Solicitor's Office, Fifth Judicial Circuit, Columbia, South Carolina, for amicus curiae.

## ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

Plaintiffs, on behalf of themselves and the class of incarcerated juveniles they represent (collectively the "plaintiffs"), move for an award of attorneys' fees and expenses pursuant to 42 U.S.C. § 1988. Defendants oppose plaintiffs' fee requests. Although the parties, facts and prior proceedings in this class-action suit are fully set forth in the prior opinions of this court, see *Alexander S. v. Boyd*, 876 F.Supp. 773 (D.S.C.1995); *Alexander S. v. Boyd* C/A No.: 3:90–3062–17 (order dated June 27, 1995), a brief review of the procedural history of the case is appropriate.

Plaintiffs initiated this action on December 28, 1990 seeking declaratory and injunctive relief, as well as damages, from the defendants, the Director of the South Carolina Department of Juvenile Justice (DJJ) and the DJJ Board Members. The suit challenges the constitutionality of certain policies, practices and conditions at the four juvenile correctional institutions operated by DJJ. Plaintiffs also mounted several statutory challenges to conditions at DJJ, particularly in regard to the educational system provided for incarcerated juveniles.

On January 16, 1991, the court appointed a *guardian ad litem* to represent the purported class. On March 7, 1991, the court certified the class as consisting of all persons presently and in the future housed within the DJJ correctional facilities. On the same date, the court approved the litigation team assembled to represent the plaintiffs in this action. The court approved participation as plaintiffs' counsel by W. Gaston Fairey, of the Columbia, South Carolina law firm of Fairey, Parise & Mills ("Fairey Parise"). The court also approved representation by the South Carolina Protection and Advocacy System for the Handicapped, Inc. ("Protection & Advocacy"), a state agency whose primary purpose is to protect the legal rights of disabled and special needs children. Protection & Advocacy was represented at the hearing by Attorneys Nancy McCormick and Holly Walker. Fairey, McCormick, and Walker represented to the court that they had extensive experience with the issues

raised in this litigation: Mr. Fairey primarily in the area of prison litigation generally; and Ms. McCormick and Ms. Walker in the area of special needs children. These attorneys requested that the court also allow the participation of the Columbia, South Carolina law firm of Nelson, Mullins, Riley & Scarborough ("Nelson Mullins"). They suggested that, because of the complex nature of the myriad issues raised in this litigation, it would be necessary to secure the services of a large law firm, such as Nelson Mullins to provide back-up support for the principal trial attorneys. It was represented to the court that Nelson Mullins had agreed to participate in this case as part of its publicly announced commitment to *pro bono* [1] activities. Acting upon these representations, the court then authorized the participation of Fairey Parise, Protection & Advocacy, and Nelson Mullins. The court admonished the attorneys at the time of their appointment that every effort should be made to minimize duplication and to exercise "billing judgment" with regard to attorneys' fees and expenses.

In March 1992, after a hearing on a preliminary matter relating to treatment of mentally ill and mentally retarded juveniles, plaintiffs sought interim attorneys' fees and costs as a result of prevailing on that issue. This request totaled $245,270.81. Upon reviewing the time sheets submitted in connection with the request, the court observed that some of the entries related to nonlegal work, such as preparation and dissemination of press releases. The court thereupon instructed counsel to review their time sheets, delete all extraneous items, and resubmit the request. Before the court could be presented with the revised request, the parties settled the issue of interim attorneys' fees. Although the amount of the settlement was not disclosed to the court at the time, the court has now been informed that the $245,270.81 request was pared down to $192,500.00, a sum which was ultimately paid by defendants.[2] At the time of this settlement, defendants extracted a promise from plaintiffs to make every effort possible to exercise billing judgment in an effort to minimize any fee that might ultimately be awarded at the conclusion of the litigation. An additional interim payment of fees to Fairey Parise ($61,750.00) and Protection & Advocacy ($28,250.00) was made in August 1993. No interim fees were paid to Nelson Mullins at that time. Thus the current fee request is for the period 1991–95 for Nelson Mullins and 1993–95 for the other attorneys.

Shortly after the March 1992 order, the parties requested that the court stay its scheduling order to allow the parties an opportunity to discuss an amicable settlement of the case. These efforts proved to be unsuccessful, however, and the case was restored to the active docket and scheduled for trial beginning June 13, 1994.

In April 1994, plaintiffs moved for a preliminary injunction to prohibit defendants from transferring nineteen-year-old juveniles from DJJ facilities to adult prisons operated by the South Carolina Department of Corrections. Plaintiffs were successful in persuading the court to issue the preliminary injunction, relying primarily upon their contention that juveniles transferred from DJJ to the adult facilities were not segregated from the adult population and were not provided with adequate educational and rehabilitative services. The court later dissolved the injunction upon learning that South Carolina law does, in fact, require special treatment for youthful offenders housed in adult facilities.

The non-jury trial of this case was conducted in June, July, and August 1994. During the course of the trial, the court heard from sixty-six witnesses (including seventeen expert witnesses) and reviewed one hundred and twenty-six exhibits consisting of several

---

1. The term *pro bono* is derived from the Latin phrase *pro bono publico* which means "for the public good" or "for the welfare of the whole." Black's Law Dictionary 1082–83 (5th Ed.1979).

2. Although it is not entirely clear from the record, it appears that Nelson Mullins agreed to a substantial reduction in its portion of the interim fee, accepting twenty-eight cents on the dollar on its initial fee submission. Nelson Mullins also absorbed $118,588 in fees and costs. This represents a significant contribution to this case for which Nelson Mullins has not been compensated and for which it is not presently seeking compensation.

thousand pages. The trial was bifurcated. Phase I addressed all constitutional challenges to all of the conditions of confinement except education. Phase II dealt with the constitutional challenge to the educational system at DJJ, and claims asserted under three interrelated federal education statutes: the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Phase I of the trial began on June 13, 1994 and concluded on July 19, 1994. Phase II began on July 21, 1994 and concluded on August 29, 1994.

Before Phase II began, two events occurred which substantially altered the need to receive extensive testimony as to the issues presented in Phase II. First, the court entered an order decertifying the class as to the claim for damages. *See* Order dated July 5, 1994. By that time, it had become clear that any damage awards might vary significantly among various members of the class. The court concluded that "disparate factual circumstances surrounding each class member would make the awarding of damages on a class basis totally unmanageable." *Id.* The court also concluded that allowing the damages claim to remain in the case would introduce significant individual liability or defense issues which would require separate hearings for each class member in order to establish defendants' liability. The second major event was the concession by the defendants, shortly before Phase II was to begin, that IDEA, Section 504 and ADA all applied to the DJJ facilities in dispute. Until that time, defendants had taken the position that the three statutes did not apply to correctional institutions.

After the conclusion of Phase II, the court took the matter under advisement and on January 25, 1995, rendered Findings of Fact and Conclusions of Law. In its January 25 decision, the court agreed with the plaintiffs on some, but not all, of the claims asserted. Rather than imposing its own remedial scheme based upon the violations that had been identified, the court afforded defendants one hundred and twenty days within which to prepare and submit to the court a plan designed to remedy the constitutional and statutory violations. On May 25, 1995 (the last day of the one hundred and twenty-day period), defendants submitted a plan to which plaintiffs timely objected. After requesting and receiving additional information from defendants, the court, on June 25, 1995, approved the remedial plan and appointed retired Family Court Judge Robert H. Burnside as the court's special master to oversee the implementation of the remedial plan.

# I

## INTRODUCTION

■ The Civil Rights Attorney's Fees Award Act of 1976, as amended, 42 U.S.C. § 1988(b), provides, in relevant part:

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

As noted, in addition to seeking relief under the remedial provisions of 42 U.S.C. § 1983 for constitutional violations, plaintiffs also asserted claims under three federal statutes, each of which provides for attorneys' fees to the prevailing party. *See* 20 U.S.C. § 1415(e)(4)(B) [IDEA]; 29 U.S.C. § 794a(b) [Section 504]; and 42 U.S.C. § 12205 [ADA]. The analytical considerations for awarding attorneys' fees under IDEA, Section 504, and the ADA are essentially the same as the analysis under Section 1988. *Disabled In Action v. Mayor & City Council of Baltimore,* 685 F.2d 881, 885 n. 4 (4th Cir.1982); *Rossi v. Gosling,* 696 F.Supp. 1079, 1084 (E.D.Va.1988).

# II

## "PREVAILING PARTY"

■ The threshold issue under 42 U.S.C. § 1988 is whether plaintiffs are "prevailing parties." *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). "To qualify as a 'prevailing party,' a plaintiff need not prevail on every claim or issue raised, but

only 'on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Spencer v. General Elec. Co.*, 706 F.Supp. 1234, 1236 (E.D.Va.1989) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)) (other citations omitted) *aff'd*, 894 F.2d 651 (4th Cir.1990). Moreover, "[a] party may prevail by virtue of a voluntary action by the opposing party through settlement or a consent decree." *Child v. Spillane*, 866 F.2d 691, 692 (4th Cir.1989).

The "prevailing party" inquiry essentially asks whether a causal connection exists between plaintiff's litigation and the relief plaintiff has obtained. *Spencer*, 706 F.Supp. at 1236–37 (citing *Spillane*, 866 F.2d at 693). The party seeking the fees must show that the lawsuit "contributed in a significant way to the winning of benefits or relief from the factual/legal condition that the fee claimant has sought to change." *Spillane*, 866 F.2d at 693 (citations omitted). The court may award fees where a party's efforts have merely served as a catalyst to the beneficial result which has occurred. *Id.*[3]

At the very least, a plaintiff must show that "actual relief on the merits of his claim materially alter[ed] the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefit[ed] the plaintiff." *Farrar*, 506 U.S. at 111, 113 S.Ct. at 573.

■ Plaintiffs in this case clearly are "prevailing parties." As the court noted in its January 25 order, defendants have, from the outset of this litigation, conceded that their facilities are impermissibly overcrowded. As to the overcrowding issue, defendants indicated that they were amenable to a court order ordering the release of juveniles to a manageable level. As to all other material allegations of the complaint, defendants either denied them or admitted them with the qualification that good-faith efforts have been made to secure the necessary funding to improve these conditions. The defendants further deny that any of the additional violations constituted deprivations of rights secured by the Constitution or various statutory provisions.

In its January 25 order, the court concluded that plaintiffs had shown violations of their constitutional and statutory rights in certain respects. Thus, the court granted to the plaintiffs some, but not nearly all, of the relief they sought in this litigation. In some areas, the court refused to award the specific relief sought by the plaintiffs. For example, the court found no constitutional deficiencies in the education system, and the court declined to engage in what it determined to be micromanagement of the juvenile facilities by imposing an elaborate grievance/ombudsman system as suggested by plaintiffs. In other areas, the court granted partial relief. For example, in the area of discipline, plaintiffs sought to have the court superimpose its own views on prison administration by establishing, among other things, maximum limits on the amount of time juveniles spend in lock-up units for disruptive behavior. The court declined to grant such sweeping relief, choosing instead to limit its ruling in the discipline area to a reasonable prohibition on the use of CS gas for enforcing orders.

In other areas, the court granted full relief requested by plaintiffs. For example, the court agreed with plaintiffs that defendants should formulate and implement a comprehensive program for classifying and segregating violent juveniles from non-violent juveniles.

As to the issue of overcrowding itself, the court declined the requests of both parties to this litigation and refused to order a release of juveniles. Instead, after observing that it has been more than a quarter of a century since any new facilities were constructed at the DJJ campus, the court required that defendants implement a program to establish additional housing units, either at a central facility in Columbia or in decentralized, community-based facilities around South Carolina.

It cannot be denied that this litigation was a catalyst for these voluntary corrective actions by defendants.

---

3. The January 25 order observed that defendants had, by the time of trial, already formulated plans and, in some instances, begun to implement plans to remedy various problems at DJJ.

Thus, although the court disagreed with *both* parties as to the overriding issue of overcrowding and agreed with plaintiffs on some, but not all, of their related challenges, plaintiffs nevertheless are prevailing parties in this litigation. They have, by this litigation, "materially alter[ed] the legal relationship between the parties by modifying defendant's behavior in a way that directly benefit[s] the plaintiffs." *Farrar,* 506 U.S. at 111, 113 S.Ct. at 573. Indeed, defendants do not challenge plaintiffs' status as prevailing parties, choosing instead to take issue with the rates, hours, and documentation submitted by plaintiffs.

## III.

### ATTORNEYS' FEES

#### A. Attorneys' Fees Generally

■ The attorneys' fees awarded by the court should comport with the underlying purpose of the Civil Rights Attorney's Fees Awards Act of 1976, which is to provide civil rights litigants effective access to the federal courts. *Buffington v. Baltimore County, Md.,* 913 F.2d 113, 129 (4th Cir.1990), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991).

Under the well-settled law in the Fourth Circuit, the court should consider the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), to determine the reasonable fee award, although there is no strict manner in which the factors are to be considered and applied. *E.E.O.C. v. Service News Co.,* 898 F.2d 958, 965 (4th Cir.1990). The *Johnson* factors are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Service News Co.,* 898 F.2d at 965 (quoting *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 n. 28 (4th Cir.), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978)); *see also Blum v. Stenson,* 465 U.S. 886, 897 n. 13, 104 S.Ct. 1541, 1548 n. 13, 79 L.Ed.2d 891 (1984). In *Johnson,* the sixth factor is expressed as whether the fee is fixed or contingent.

■ Applying certain *Johnson* factors, the court determines a reasonable hourly rate and the number of hours reasonably expended by counsel, then multiplies the rate by the hours in order to determine the "lodestar figure," which is normally considered the reasonable fee in the case. *Service News Co.,* 898 F.2d at 965 (citing *Blum,* 465 U.S. at 888, 104 S.Ct. at 1543); *Plyler v. Evatt,* 902 F.2d 273, 277 (4th Cir.1990). In "exceptional circumstances," this presumptively fair lodestar figure may be adjusted to account for results obtained and the quality of representation. An attorney's fee award should accomplish "fair and reasonable compensation," *Blum,* 465 U.S. at 901, 104 S.Ct. at 1550, in keeping with Congress' dual purpose of fully compensating prevailing parties for their attorneys' fees and encouraging attorneys to handle civil rights cases. A proper computation of the lodestar fee will, in the great majority of cases, constitute the "reasonable fee" contemplated by Section 1988.

■ Finally, in addressing the reasonableness of the fee award in the case at bar, the court must be mindful of the Supreme Court's admonition in *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), that "[a] request for attorney's fees should not result in a second major litigation."

#### B. Nelson Mullins' *Pro Bono* Status

As noted previously, when the court first approved the litigation team assembled to represent the plaintiffs in this action, the court was informed that Nelson Mullins would participate in the case *pro bono.* This participation was part of the firm's com-

mendable decision to participate in the American Bar Association's *pro bono publico* program by encouraging each of its attorneys to devote a certain number of hours a year to *pro bono* activities. It was the court's understanding that Gaston Fairey and Nancy McCormick would be the principal trial attorneys in the case, and that Nelson Mullins would provide litigation support to these two relatively small law firms. Nelson Mullins is a large, highly successful, and well-managed law firm with the resources to underwrite and support a complex lawsuit such as this one. Without Nelson Mullins' support in this litigation, it is doubtful that the smaller firms would have been able to fully develop the very important issues in this case.

After plaintiffs prevailed on the first issue to be decided by this court (that of the subclass involving mentally retarded and mentally ill juveniles), all of plaintiffs' counsel, including Nelson Mullins, sought to be compensated under Section 1988. Nelson Mullins informed the court that it intended to seek whatever the fees the court might award under the fee-shifting statutes and to deposit those fees into its *pro bono* account so as to be able to fund future *pro bono* activities. As noted previously in this order, the parties settled the issue of interim fees before the court could fully address this matter, and, as indicated, Nelson Mullins substantially compromised its fee and absorbed many costs that would normally be awarded under Section 1988. *See supra* note 2.

Shortly before the case went to trial, Nelson Mullins' senior partner wrote to the court to inform the court that because the case had consumed more time than any lawyer had originally envisioned, Nelson Mullins wished to be released from its *pro bono* commitment in this case to allow it to be compensated as any privately retained attorney.[4] The court agreed to such action.

After the present petition for attorneys' fees was submitted in this case, Nelson Mullins informed the court, by way of a reply memorandum to defendants' opposition memorandum, that it intends to contribute whatever fees the court awards to it to an appropriate charity for children, thus essentially reversing course again and reverting to *pro bono* status.

Defendants suggest in their memorandum that because Nelson Mullins entered the case on a *pro bono* basis, it would not be appropriate to award attorneys' fees to this firm. Defendants cite no authority for this proposition, and the court's own independent research has disclosed none. Indeed, every court that has considered the question has concluded to the contrary. These cases generally hold that "[a]n award of attorney's fees to a successful plaintiff is not contingent upon an obligation to pay an attorney and is not affected by the fact that no fee was charged." *Martin v. Heckler,* 773 F.2d 1145, 1152 (11th Cir.1985). The court in *Rodriguez v. Taylor,* 569 F.2d 1231 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978) noted:

As a general matter, awards of attorney's fees where otherwise authorized are not obviated by the fact that individual plaintiffs are not obligated to compensate their counsel. The presence of an attorney-client relationship suffices to entitle prevailing litigants to receive fee awards.... Of course, since the object of fee awards is not to provide a windfall to individual plaintiffs, fee awards must accrue to counsel....

The statutory policies underlying the award of fees justify such shifting without regard to whether the individual plaintiff initially assumed the financial burdens of representation. The traditional, and generally applicable, "American Rule" denies successful litigants the possibility of recovering fees from their opponents. Beyond the applicability of several narrow judicially recognized exceptions to the American Rule, the Supreme Court insists that Congress must affirmatively authorize fee awards.... Congress, in fact, has often taken up the cudgel and authorized or mandated fee awards in suits brought under diverse statutes.... Typically, con-

---

4. Nelson Mullins had earlier offered to waive its claim for attorney fees if the case could be settled relatively early in the litigation. Settlement ef-

forts were unsuccessful and the parties then engaged in extensive litigation and a lengthy trial.

gressionally approved awards are designed to encourage private enforcement of individual rights and to deter socially harmful conduct. For example, Congress, in passing the Civil Rights Act of 1964, authorized fee awards for "private attorneys general" who might otherwise be deterred from bringing suit because of the burdensome costs of litigation.... More recently, Congress responded to the Supreme Court's decision in [*Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)] by closing 'gaps' left in other civil rights laws and authorized the award of attorneys' fees in actions brought under several provisions, including 42 U.S.C. §§ 1981, 1982, 1983, and 1985.... The award of fees to legal aid offices and other groups furnishing *pro bono publico* representation promotes the enforcement of the underlying statutes as much as an award to privately retained counsel.

*Id.* at 1245 (citations omitted).

Cases in which attorneys' fees were awarded pursuant to statutory fee-shifting provisions to *pro bono* counsel include: *Martin v. Heckler,* 773 F.2d 1145, 1152 (11th Cir.1985) (plaintiff co-counsel, a legal services corporation attorney, did not waive his right to an attorneys' fee award under the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. § 1988) when he agreed to represent plaintiffs without fees); *Cornella v. Schweiker,* 728 F.2d 978, 986 (8th Cir.1984) ("[A]llowing fee awards to *pro bono* counsel under the [Equal Access to Justice Act] 'serves to insure that legal services groups, and other *pro bono* counsel, have a strong incentive to represent indigent social security claimants.' ") *quoting Ceglia v. Schweiker,* 566 F.Supp. 118, 123 (E.D.N.Y.1983); *see also New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 70 n. 9, 100 S.Ct. 2024, 2034 n. 9, 64 L.Ed.2d 723 (1980) (rejecting argument that representation by public interest group justified reducing fees in a case brought under Title VII of the Civil Rights Act of 1964; *Mitten ex.rel. Mitten v. Muscogee County Sch. Dist.,* 877 F.2d 932, 937 (11th Cir.1989) (in awarding fees in IDEA case in which fees had not been paid by parents of student with disability even though parents could afford fees, the court noted: "[t]he statutorily guaranteed right to attorneys' fees does not depend on a party's economic resources or the availability of free legal assistance"), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990); *Oldham v. Ehrlich,* 617 F.2d 163, 168 (8th Cir.1980) ("it is inappropriate to consider that the prevailing plaintiff's attorney was working for a legal aid organization" when arriving at a reasonable attorneys' fee award under § 1988); *Entertainment Partners Group, Inc. v. Davis,* 155 Misc.2d 894, 590 N.Y.S.2d 979, 986 (Sup.Ct.1992), *aff'd,* 198 A.D.2d 63, 603 N.Y.S.2d 439 (N.Y.App.Div. 1993) (discussing New York and federal treatment of *pro bono* and *pro se* counsel).

■ An attorney's obligation to render *pro bono* service is outlined under the South Carolina Rules of Professional Conduct:

A lawyer should render public interest legal service. A lawyer may discharge this responsibility by providing professional services at no fee or a reduced fee to persons of limited means or to public service or charitable groups or organizations, by service in activities for improving the law, the legal system or the legal profession, and by financial support for organizations that provide legal services to persons of limited means.

S.C.App.Ct. R. 407, Rule 6.1. The American Bar Association's most recent version of Model Rule 6.1 encourages lawyers to render at least fifty hours of *pro bono publico* legal services per year. Model Rule of Professional Conduct 6.1 (1993). A substantial majority of these hours should be provided without fee or expectation of fee to persons of limited means. *Id.* However, service is still considered to be *pro bono* when the lawyer receives statutory fees. Commentary to Model Rule 6.1 explains:

[S]ervices rendered cannot be considered *pro bono* if an anticipated fee is uncollected, but the award of statutory attorney's fees in a case originally accepted as *pro bono* would not disqualify such services from inclusion under this section. *Lawyers who do receive fees in such cases are encouraged to contribute an appropriate portion of such fees to organizations or*

*projects that benefit persons of limited means.*

*Id.* at comment (emphasis added).

Nelson Mullins has advised this court that they intend to follow these recommendations and donate a significant portion of the fees received to charitable purposes. Though not strictly required, such donation is in keeping with the highest standards of the legal profession and will, hopefully, serve to further the interests advanced by Nelson Mullins in this action: improving the conditions of confinement and opportunities for rehabilitation of the young men and women at DJJ.

█ Defendants also suggest that any fee award to Nelson Mullins must be tempered by the realization that Nelson Mullins gained benefits from its *pro bono* activity. Defendants refer specifically to an award presented to the firm by the American Bar Association because of its public commitment to *pro bono* work. Defendants also suggest that Nelson Mullins is able to recruit some of the best and brightest law school graduates because of its *pro bono* program.

Again, defendants cite no authority for this argument, and the court has been unable to locate a case holding that intangible benefits such as goodwill and recruiting benefits may be relied upon by a court to reduce an attorneys' fee award. Indeed, the only Fourth Circuit case addressing this issue is to the contrary. In *Anderson v. Morris,* 500 F.Supp. 1095 (D.Md.1980), *judgment vacated,* 658 F.2d 246 (4th Cir.1981), plaintiffs' attorneys were successful in representing an independent candidate for President of the United States in an action against Maryland officials challenging the constitutionality of a state law preventing the candidate from being on the general election ballot. In fashioning an appropriate fee award, the district court diminished the award for what the court determined were the "intangible benefits" to the attorneys involved in such high-profile litigation. The court found that participation in such a "cause celebre" would enhance the professional goodwill and reputation of the attorneys. For this reason, the court reduced the fee by an appropriate amount to offset the intangible benefits to the attorneys. *Id.* at 1107 *reversed in part* 658 F.2d 246 (4th Cir.1981).

On appeal, the Fourth Circuit Court of Appeals held that it was inappropriate for the district court to discount the fee because of the intangible benefits conferred upon plaintiffs' attorneys. Observing that the legislative history of Section 1988 requires that counsel are to be paid "as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter," the Court of Appeals held that the district court's reduction of fees for intangible benefits was not appropriate. *Anderson v. Morris,* 658 F.2d 246, 248 (4th Cir.1981) (internal quotation omitted).

It is thus clear, under well-established law, that Nelson Mullins is entitled to be compensated for its reasonable attorneys' fees under Section 1988, even though it participated in this case on a *pro bono* basis. In determining the amount of the fee, the court will not discount the fee because of the goodwill derived by Nelson Mullins from its *pro bono* work.

As noted later in this opinion, however, Nelson Mullins' involvement on a *pro bono* basis did lead to a situation where a large number of attorneys were assigned to work on the case, resulting in a degree of overlap that must be taken into account in determining the reasonable number of hours to be compensated. *See* page 943, *infra.* The court emphasizes here that it in no way faults Nelson Mullins for the number of attorneys involved. Given the nature of *pro bono* work and the realities of meeting firm goals, it was, no doubt, necessary to spread the work around more than would be necessary for a fee paying client. Nonetheless, the court cannot penalize defendants by requiring them to pay for any resulting duplication.

It is with these principles in mind that the court now turns to the particular facts of this case.

## C. Calculation of the Lodestar

### 1. Reasonable Hourly Rate

█ The first step in setting a reasonable fee is determining the appropriate hourly rate. *Plyler v. Evatt,* 902 F.2d 273, 277 (4th Cir.1990). The reasonable hourly rate

must be consistent with the "market rate" in the relevant community. The court must assess the experience and skill of the prevailing parties' attorneys and compare their rates to the rates prevailing in the community for "similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984). The relevant community for fee determination is the judicial district in which the trial court sits. *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 226, 232 (2d Cir.1987). In this case, the relevant community is the District of South Carolina. Relevant to determining the "market" or reasonable rate are *Johnson* factors three, four, five, eight, nine, ten, eleven, and twelve.[5]

■ The third *Johnson* factor requires the court to consider the skill required to properly perform the legal services rendered. In determining this, the court must determine whether the case presented plaintiffs' counsel with novel or complicated issues. In this case, the court finds that it did. As the court has noted on several previous occasions, there have been few, if any, cases in this area that have been litigated to judgment. The vast majority of juvenile justice lawsuits have been settled. The United States Supreme Court has thus far declined to enunciate the principles of constitutional law that apply to juveniles, even in a school setting. *See Ingraham v. Wright,* 430 U.S. 651, 669 n. 37, 97 S.Ct. 1401, 1411 n. 37, 51 L.Ed.2d 711 (1977) (expressly reserving the question of whether the Cruel and Unusual Punishment Clause applies to schools). In addition, plaintiffs' counsel were opposed by equally skillful and well-prepared attorneys representing defendants. Thus, the case presented challenging issues of both fact and law requiring considerable skill on the part of the attorneys.

The fourth *Johnson* factor requires the court to determine the opportunity costs for plaintiffs' counsel in pursuing this litigation. The action was initiated in December 1990

and adjudicated on its merits in January 1995. For approximately one-half of the four-year period during which the case was pending, the court placed the case on its inactive docket in an effort to allow the parties to attempt to reach an amicable settlement. In addition, the court has attempted, whenever possible, to accommodate the schedules of counsel. To this extent, therefore, plaintiffs have not shown significant opportunity costs in litigating this case. On the other hand, because of the novelty and complexity of the issues presented, it was necessary for the court to conduct numerous status conferences, motions hearings, and other proceedings over the four-year life span of this case that required the attendance of counsel. Necessarily, participation in these court proceedings has denied plaintiffs' counsel the opportunity to work on other fee-producing cases.

■ The fifth *Johnson* factor requires the court to consider "the customary fee for like work." In making such a determination, the court should consider "various information, including '(affidavits reciting the precise fees that counsel with similar qualifications have received in comparable cases; information concerning recent fee awards by courts in comparable cases; and specific evidence of counsel's actual billing practice or other evidence of the actual rates which counsel can command in the market.'" *Trimper v. City of Norfolk, Va.,* 846 F.Supp. 1295, 1305 (E.D.Va.1994) quoting *Buffington v. Baltimore County Md.,* 913 F.2d 113, 130 (4th Cir.1990) *cert. denied* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991)).

The rates sought by the various attorneys who have participated in this case are all set forth on the table appearing on pages 943–946, *infra.* For the most part, these rates range between $70.00 per hour and $150.00 per hour. Only one attorney, Gaston Fairey, seeks to be compensated at a rate higher than $150.00 per hour. Mr. Fairey seeks to be compensated at the rate of $225.00 per

---

**5.** This court finds that the sixth *Johnson* factor is not relevant to the award in this case because "contingency multipliers may not be allowed in statutory fee cases." *Sheppard v. Riverview Nursing Ctr.,* 870 F.Supp. 1369, 1380 (D.Md.1994)

(*citing City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)). The court also finds that *Johnson* factor seven and eleven are not appropriate for consideration in this case.

hour for out-of-court work and $250.00 per hour for in-court work. The rates for all of the other attorneys are constant for in-court and out-of-court work.

Defendants challenge the hourly rates submitted by plaintiffs. Rather than focus upon the two attorneys with the highest rates (Fairey and McCormick), defendants devote most of their attention to the rates charged by most of the Nelson Mullins' associates, contending that the rates are excessive and above the market rates for attorneys with similar training and experience. Defendants also suggest that in automobile accident cases, some of these young associates bill at lower rates than those submitted here.

The court has carefully considered the hourly rates submitted and the documentation and affidavits furnished by plaintiffs to support these rates. Plaintiffs support these rates with affidavits indicating that these are their normal, ordinary and customary rates for similar complex litigation. In other words, these rates reflect counsels' actual billing practice for this type of lawsuit. Plaintiffs have also furnished the court with affidavits from senior partners in other large Columbia firms which indicate that young associates with prestigious firms in South Carolina can command rates at or above $100 per hour as the Nelson Mullins associates seek in this case. The court finds that the rates sought by the Nelson Mullins associates are fair and reasonable.

Although not specifically challenged by defendants, the court has carefully scrutinized Mr. Fairey's hourly rates and has determined that they are appropriate in this case as well. Mr. Fairey was the lead attorney in this case and the one with the most experience in civil rights and prison litigation.

Hourly rates of $250.00 or more have been approved and awarded in this district in the following cases (all of which the court finds to be of similar complexity):

1) $250.00 per hour: *C & S National Bank v. Specialty Equip. Co.*, C/A No.: 6:87–1783–17 (D.S.C.1988) [contract dispute, Judge Joseph Anderson].

2) $250.00 per hour: *Kitchens v. U.S. Shelter*, C/A No.: 6:82–1951–1, 1988 WL 108598 (D.S.C.1988) [securities class action, Judge Falcon Hawkins].

3) $250.00 per hour: *Cox v. Champion International*, C/A No.: 3:81–2580–2 (D.S.C. 1986) [antitrust action, Judge Weston Houck].

4) $300.00 per hour: *Phillips v. Bebber*, C/A No.: 9:88–2051–3 (D.S.C.1991) [ERISA, Judge Ross Anderson].

5) $250.00 per hour: *Elmore v. Cone Mills Corp.*, C/A No.: 6:88–3258–17 (D.S.C.1991) [ERISA, Judge Joseph Anderson], (*rev'd in part on other grounds*), 23 F.3d 855 (4th Cir.1994) (*en banc*).

6) $265.00 to $285.00 per hour: *South Carolina Soft Drink Litigation*, C/A No.: 3:90–2003–21 (D.S.C.1993) [Antitrust, Judge William Traxler].

Finally, as to all of the hourly rates generally, the Fourth Circuit, in *Daly v. Hill*, 790 F.2d 1071 (4th Cir.1986), authorized the court to consider the effect of delayed compensation upon the attorneys' fees awarded. The court stated:

> Delay necessarily erodes the value of a fee that would have been reasonable if paid at the time the services were rendered.... The court may increase the hourly rates to reflect current market rates, or it may increase the lodestar to counterbalance the effect of inflation and foregone interest on the value of the fee. The particular method of accounting for delay in payment is within the discretion of the district court.

790 F.2d at 1081. Similarly, in *Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the United States Supreme Court approved enhancement of fee awards for delay in payment. The Court found that an appropriate upward adjustment can be reached by "the application of current rather than historical hourly rates or otherwise." *Id.* at 283–84, 109 S.Ct. at 2469. Thus, the delay in payment (four years for Nelson Mullins and almost three years for the other lawyers) is a fact that the court may consider in setting the hourly rates.

Thus, after carefully considering the affidavits submitted, the fees that counsel with similar qualifications have received in similar

cases, the evidence of counsel's actual billing practice, and the several year delay in receiving compensation, the court approves the rates set out in the table on page 943–946, *infra.*

The eighth *Johnson* factor requires the court to look at the amount in controversy and the results obtained. As noted previously, the court decertified the class as to the damages claims, leaving only plaintiffs' claims for equitable relief. Also, plaintiffs did not prevail on all of their claims. Plaintiffs' counsel did, however, obtain significant results for their clients.

This litigation identified several constitutional and statutory deficiencies in a major state agency. Plaintiffs succeeded in bringing about changes in the conditions of confinement and in the programs, practices and procedures of the agency charged by state law with rehabilitating and educating our state's wayward youth. As a result of counsel's efforts, juveniles are no longer sprayed with tear gas for relatively minor infractions, cockroaches are being eliminated from the cafeterias, aggressive juveniles are now being separated from more passive ones, ground has been broken for new facilities in Columbia and elsewhere, much-needed improvements to medical care are being implemented, and new programs are planned to enable all class members to attempt to correct their behavior while at DJJ. It is doubtful that many of these improvements would have occurred had this litigation not been brought.

*Johnson* factor nine requires the court to consider the reputation, experience and ability of the attorneys involved. This court has had an ample opportunity to observe these attributes of the attorneys during the twenty-two hearings that were conducted prior to the trial and during the six grueling weeks of the trial on the merits. In addition, plaintiffs have supported their fee petition with affidavits from other attorneys and biographical information regarding all of the attorneys who participated in this litigation. The court finds that the principal trial attorneys, Mr.

Fairey, Ms. Romosca, Ms. McCormick, and Mr. Meriwether, all to be attorneys of excellent reputation, experience, and ability. Similarly, the other attorneys in the various firms who played a subsidiary role (Ms. Walker with Protection & Advocacy, Ms. Harris with Nelson Mullins, and various junior associates with Nelson Mullins) are all highly motivated, skilled attorneys who acquitted themselves well in this litigation.

*Johnson* factor ten requires the court to consider whether the case was undesirable in the legal community in which it arose. The plaintiffs in this case are a class of juveniles who have broken the criminal laws of South Carolina. Thus, to some extent, the case was undesirable. However, it is obvious that many civil rights cases for which fees are sought under Section 1988 involve claims by unappealing plaintiffs. Thus, this factor militates in favor of the plaintiffs' fees, but only slightly more so than in the typical civil rights action.[6]

As to *Johnson* factor twelve, the total fee sought in this case is not excessive when compared to other fees awarded in complex litigation in this district. *See Elmore v. Cone Mills Corp.,* C/A No.: 6:88–3258–17 [Total fee of $3.5 million awarded in ERISA case after a one-week trial]; *Craps v. Jim Walter, Inc.,* C/A No.: 3:94–3285–17 [defendants settled truth-in-lending class action shortly after 12(b)(6) motion to dismiss was denied and agreed to pay attorneys' fees of $3 million under state fee-shifting statute]; *Faulkner v. Jones,* C/A No.: 2:93–488–2, 1994 WL 456621 [plaintiff's counsel reported to court that attorneys' fees already exceed $4 million in challenge to single-gender admissions policy of state-funded university].

### 2. Hours Reasonably Expended

██ The court may not simply accept as reasonable the number of hours reported by counsel. *Espinoza v. Hillwood Square Mut. Ass'n,* 532 F.Supp. 440, 446 (E.D.Va.1982). The court should not compensate plaintiff's counsel for hours which it finds "excessive, redundant or otherwise unnecessary."

---

6. Absent the availability of legal fees, most civil rights actions (particularly those seeking injunctive relief) would be highly undesirable. Here, plaintiffs were aware from the outset that they would be successful to at least a large degree, and the fees would ultimately be recovered.

*Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *see Anderson v. Morris,* 658 F.2d 246, 249 (4th Cir.1981); *Espinoza,* 532 F.Supp. at 446–47 (hours sought should be reduced by hours which are duplicative, unproductive, or are spent on issues on which plaintiff did not prevail). Additionally, the first and second *Johnson* factors direct the court to consider the time actually expended by counsel and the novelty or complexity of the issues involved in the matter.

█ Defendants contend that plaintiffs' counsel's hours are inadequately documented, duplicative, and excessive. As to documentation generally, defendants contend that plaintiffs have submitted billing records that are "far from meticulous." They contend that generalizations such as "trial preparation" and "various telephone calls and conferences" are not specific enough to allow for judicial review.

The court has reviewed the time sheets in dispute and concludes that the entries are specific enough to allow for appropriate judicial review. Although some attorneys were more careful than others in keeping their records (Nelson Mullins attorney William Brown being a particular example of a good record-keeper), the records are specific enough for the court to make an informed judgment as to the appropriateness of the work.

Defendants also challenge the hourly submissions by pointing to internal inconsistencies in the various time sheets. Plaintiffs have satisfactorily explained these inconsistencies, however. For example, Rochelle Romosca's records include entries for time spent in certain telephone conversations with Gaston Fairey, while Fairey's records do not show similar phone conversations on that date. In plaintiffs' reply brief, counsel explains that the phone calls were made by Romosca to Fairey while Fairey was on his summer vacation, a period during which he did not keep time records.

Another apparent inconsistency occurred when two attorneys indicated that they met with a third attorney in preparation for trial, but the third attorney's time sheets do not reflect the same meeting. The third attorney's time sheets do, however, include a significant block of time for trial preparation, which is not inconsistent with the time sheets of the other attorneys.

Although the court disagrees with defendants on the adequacy of the records generally and with the alleged internal inconsistencies identified by defendants, the court agrees with defendants that some hours need to be deleted in calculating the lodestar fee in this case.[7]

█ First, the court will disallow a portion of the charges asserted for "project assistants." Although the court will compensate plaintiffs for time spent by attorneys, law clerks, and paralegals, it appears to the court from a review of the Nelson Mullins job description for project assistants and from time sheets from Nelson Mullins and Fairey Parise that much of the work done by these assistants was of a clerical or secretarial nature. Fees for work done by secretaries is not compensable under Section 1988. *Richardson v. Byrd,* 709 F.2d 1016, 1023 (5th Cir.) *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). The court's review of the time sheets by the project assistants reveals that approximately three-fourths of their work was similar to that of a courier or secretary and that the remainder of their work was more akin to that of a

7. Defendants raise a variety of additional challenges to the fee request. For example, defendants contend that some of the time sheets group tasks in one large block of time that is inadequate to allow the court to ascertain what was actually performed. Defendants also suggest that some of the time sheets indicate that too much time was spent on various tasks such as "trial preparation" after hours while the trial was in progress. Defendants further contend that some of the work performed by someone with a high skill level could have been performed by a person with a lower skill level. The court has carefully considered defendants' arguments regarding these issues as well as the plaintiffs' responses to these arguments. The court has modified the fee request in a manner that the court believes is consistent with the law regarding attorneys' fees. The failure of the court to address all of defendants' objections in the text of this order should not be taken as an indication that the court did not carefully consider defendants' position as to each of these matters.

paralegal or law clerk. For this reason, the court will disallow three-fourths of the fees for the project assistants. This results in a reduction of $33,271.38 for time spent by Nelson Mullins project assistants and $485.65 for time spent by Fairey Parise project assistants.[8]

■ Defendants also contend that the number of hours submitted is excessive. Defendants concede that plaintiffs prevailed on some of the issues they raised in this litigation, but suggest that the court should disallow compensation for work done on the issues on which they did not succeed.

*Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), provides guidance on the issue of determining a reasonable number of hours to be awarded in a case in which all claims are not successful. In addressing the issue of a reasonable number of hours to be awarded in such situations, the Supreme Court set forth general principles to be followed:

> We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Id.* at 440, 103 S.Ct. at 1943.

Plaintiffs argue that they fall in the middle category identified in *Hensley.* In order to qualify for that category, plaintiffs must establish that the lawsuit consisted of related claims and that the plaintiffs won substantial relief.

In this case, the court has little difficulty in concluding that the claims were related. As *Hensley* illustrates, in institutional reform litigation, where the claims all relate to conditions within particular institutions and plaintiffs seek application of a consistent legal theory, the different claims are related both in fact and in law. As noted by one commentator:

> Institutional reform litigation, like that involved in *Hensley,* often concerns conditions in a single institutional setting and the objective of a plaintiff class to gain overall improvements in their treatment that subsumes a number of related legal claims. Thus, the Supreme Court's view that the various winning and losing claims in *Hensley,* although factually diverse and only loosely subsumed under the constitutional challenges, were interrelated may be understood from the prospective that "the plaintiffs pursued them to remedy the same general injurious conduct, i.e. the denial of minimally adequate treatment."

2 Schwartz & Kirlin, *Section 1983 Litigation,* § 22.3 at 282–83 (2d Ed.1991) (citations omitted).

In examining the second prong, that is the overall success of the plaintiff's case, it is "[not] necessarily significant that a prevailing plaintiff did not receive all the relief requested." *Hensley,* 461 U.S. at 435, n. 11, 103 S.Ct. at 1940, n. 11. Moreover, "the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." *Id.* at 435, 103 S.Ct. at 1940.

Thus, although this court disagreed with plaintiffs as to many of the claims asserted in this case, plaintiffs prevailed on the merits of a number of significant claims and obtained significant relief. For this reason, the court will not reduce the hours submitted to account for unsuccessful claims, such as the effort to establish a population ceiling. The court will also not reduce the total hours for

---

8. Several project assistants, paralegals and at least one law clerk included in their submissions time spent in training on June 3, 1994. The court would normally disallow this time which amounts to under $500 in fees. The court's reduction of the overall project assistant request by 75%, however, is considered by the court to offset any training time by project assistants or others. There is, therefore, no need to reduce fees further to account for these training hours.

unsuccessful claims, such as those relating to education, discipline, access to a law library, and other issues on which plaintiffs basically failed. These claims were all interrelated with the claims on which the plaintiffs prevailed, and it would be inappropriate to delete these hours.

The court has, however, identified four discrete areas in which certain hours submitted by plaintiffs' counsel should be deleted or reduced substantially. These four areas are discussed below.

The first area relates to the April 1994 hearing on plaintiffs' request for a preliminary injunction prohibiting the transfer of nineteen-year-old juveniles to adult correctional facilities. As noted in the introductory portion of this order, plaintiffs' counsel represented to the court that an injunction was appropriate because state law did not require, and state officials did not provide, appropriate educational treatment and rehabilitative services to juveniles who were transferred. Acting upon a meager record and without the benefit of full legal research, the court granted the preliminary injunction, which remained in place until the court's decision on the merits issued on January 25, 1995. At that time, the court dissolved the injunction and observed that South Carolina state law clearly provides for the segregation of youthful offenders from the adult population and specifically provides a full panoply of educational and rehabilitative services for those juveniles. Thus, the court's January 25 Order dissolving the preliminary injunction observed that plaintiffs had pursued the wrong remedy. Specifically, plaintiffs had sought to have this court enjoin one state agency (DJJ) from fulfilling its obligations because another state agency (the Department of Corrections) was allegedly not complying with the mandates of South Carolina state law.[9]

Because this issue was separate from the other issues and because plaintiffs utterly failed to prevail on this claim, the court will disallow the brief period of time spent on this issue. According to the court's review of the time sheets submitted, the total in-court time to be disallowed for Gaston Fairey (1.75 hours), Rochelle Romosca (1.75 hours), and Robert Meriwether (1.75 hours) is 5.25 hours. To this the court will add a total of 21 hours in preparation for the injunction hearing. The preparation time for this hearing is not specifically itemized in the submissions to the court, and the court has arrived at what it reasonably believes to be a fair amount for preparation time by adopting a four-to-one ratio which assumes that for every hour spent in court, but the attorney spends four hours in trial preparation.[10]

The second area of reduction involves the time spent on the first day of trial receiving testimony and proffered photographs taken by Coates Crewe, a local photographer. During the first day of testimony at trial, plaintiffs sought to introduce a series of approximately three hundred photographs taken by Crewe. These photographs allegedly depicted typical living conditions at various DJJ dormitories. Defendants challenged the admissibility of these photographs and requested an evidentiary hearing so that the court could determine whether a proper foundation could be laid. Crewe was then called to the stand and indicated that his photographs were taken at random and represented typical scenes in DJJ dormitories. On cross examination, he denied "staging" any of the photographs. He specifically denied requesting juveniles to place their mattresses on the floor and denied requesting juveniles to "mess up" their dormitory rooms so that living conditions would appear worse than they actually were.

Defendants then called one juvenile who contradicted Crewe by testifying that Crewe did, in fact, request that the juveniles help him stage photographs so as to overstate the undesirable conditions at DJJ. Allegedly, Crewe told the juvenile that he [Crewe] was there to help "shut down" some of the dorms

---

9. The court expresses no opinion as to whether the Department of Corrections is complying with state law.

10. A four-to-one ratio in determining trial preparation time is probably conservative. Mr. Fairey's total time sheets in this case show approximately a ten-to-one ratio for trial preparation to trial time.

so the juveniles could be sent home early. Defendants indicated that they had several other juveniles, as well as the DJJ chaplain, who were prepared to corroborate the testimony of the first juvenile. Plaintiffs then requested a short hearing and thereafter announced that they were withdrawing the Coates Crewe photographs and would not attempt to introduce them into evidence. Because the photographs and the time spent discussing them were superfluous, the court will disallow one hour in court and a reasonable approximation of four hours for out-of-court trial preparation time regarding these photographs for each of the attorneys and support personnel present on the first day of trial.[11]

The third area of reduction relates to the extensive testimony the court heard in the latter part of Phase II of the trial. As noted in the introductory portion of this order, plaintiffs engaged in discovery and prepared for trial under the assumption that it would be their burden to prove that all three special education statutes (IDEA, Section 504, and ADA) applied to the facilities in dispute in this litigation. Plaintiffs also prepared for trial assuming that they would be required to prove specific violations so as to support an award of damages. Before Phase II could be litigated, however, two developments occurred which significantly altered the need to receive this testimony. As has been noted, the court decertified the class as to the damages claim, and defendants made a last-minute concession that the three statutes apply to the institutions being challenged in the litigation. This prompted the court to inquire of plaintiffs' counsel why it would be necessary to receive testimony about wholly-past violations. The court expressed its view, on several occasions, that any injunctive relief the court could award would be limited to a requirement that the defendants comply with the three statutes in the future. In other words, with the damages issue removed from the case, and with the defendants conceding that the statutes apply to the facilities, there was really little left to litigate in Phase II of the litigation. The

court also observed that the three statutes had received scant attention in the decisions of other judges who have ruled upon challenges to juvenile correctional facilities around the country. Virtually all of these other cases were resolved by way of a consent order, and these consent orders dealt with the three statutes in cursory fashion, by simply requiring the defendants to bring themselves into compliance.

In spite of the court's repeated entreaties to streamline Phase II of the trial, plaintiffs insisted on putting up testimony that stretched over six days. The court cannot fault plaintiffs' counsel for thoroughly developing the facts and legal issues to be presented in Phase II. This thorough and extensive pretrial factual development and legal research undoubtedly led to the concession by defendants which made much of the trial testimony unnecessary in Phase II. It was not, however, necessary to receive six days of testimony in Phase II. For these reasons, the court will disallow some of the hours spent presenting the testimony in Phase II. According to the court's records, Phase II was litigated on the following dates: July 21, 22, 25, 26, 27, and 28. The first two days (July 21 and 22) were devoted primarily to constitutional challenges to the educational system. Although plaintiffs did not prevail on these constitutional claims, the court has determined that the constitutional challenges to the educational system were inextricably intertwined with the constitutional challenges to other aspects of incarceration. The court will thus allow compensation for July 21 and July 22. According to the court's notes, the remainder of Phase II was devoted exclusively to testimony regarding the three federal education and disability statutes. The court will disallow this trial time as being redundant and unnecessary. The court will also disallow the time spent preparing proposed findings and conclusions for Phase II, because they repeated much of the unnecessary testimony and were not adopted by the court. The court announced its tentative conclusion in this regard and asked counsel to compute

---

11. The court's notes indicate approximately one hour was spent in court dealing with the photos. As with the injunction hearing, the court uses a

four-to-one ratio for determining trial preparation time.

the time each attorney spent during the disallowed portion of Phase II. This information has been received by the court and provided to defense counsel. *See* Letter by Gaston Fairey dated October 26, 1995. Defendants have not challenged the calculations contained in the October 26 letter. The court adopts these calculations and will therefore reduce plaintiffs' award by $52,596.75, which represents the amount of fees allocated to the time the court has disallowed as to Phase II.

■ The final area of reduction involves the duplication necessarily arising out of the *pro bono* assignments within the Nelson Mullins firm. *See page 935 supra.* The fee submission by Nelson Mullins in this case includes the work of twelve attorneys, both partners and junior associates. Many of the associates devoted relatively brief periods of time to the case. It is obvious to the court that Nelson Mullins has fulfilled its commitment to *pro bono* activity by attempting to conscientiously allow many of its junior associates, some of them recent law school graduates, to work on this case as part of the firm's *pro bono* commitment, which includes an obligation to engage in such work by each member of the firm. It also appears to the court that Nelson Mullins used this litigation, in part, to provide these bright young attorneys with an opportunity to participate in the trial and to gain valuable courtroom experience. The court finds no fault with such practices in this case; indeed, these young associates performed admirably and contributed immeasurably to the successful results obtained in the litigation. Spreading the work among so many lawyers, commendable as it may be, has its drawbacks, however. The involvement of so many attorneys necessarily involves a degree of overlap and duplication that must be taken into account by this court in determining the reasonable number of hours to be compensated.

Courts will substantially reduce bills when unnecessary duplication is brought about by having an excessive number of attorneys involved in a case. *Sun Pub. Co. v. Mecklenburg News, Inc.,* 823 F.2d 818 (4th Cir.1987); *Goodwin v. Metts,* 973 F.2d 378, 381 (4th Cir.1992); *Singer v. Shannon & Luchs Co.,* 779 F.2d 69, 70–71 (D.C.Cir.1985); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 953 (1st Cir.1984). Duplicative work, such as several attorneys attending the same hearing, should generally not be part of a fee award.

The court finds this overlap and duplication [12] to warrant a ten-percent reduction in the overall Nelson Mullins fee submission, said percentage to be deducted after the deductions described in the preceding paragraphs.[13]

After making the foregoing findings, the reasonable attorneys' fee to be awarded in this case is calculated as follows:

### FAIREY, PARISE & MILLS, P.A.

| Attorney | Rates Out/In | Hours Out/In | Fees |
|---|---|---|---|
| W. Gaston Fairey | $225/$250 | 1258.25/115 | $311,856.25 |
| Less: | | | |
| April 21, 1994 injunction hearing | | 7/1.75 | − $ 2,012.50 |
| Coates Crewe testimony | | 4/1 | − $ 1,150.00 |
| Phase II reduction | | 2.25/.5 | − $ 631.25 |
| Net: | | | $308,062.50 |

12. For example, the time sheets of many of the Nelson Mullins associates include time for touring the DJJ facilities. It is not reasonable to expect defendants to pay a large number of attorneys to tour its facilities in a case where many of the plaintiffs' basic contentions (such as overcrowding) were not in dispute.

13. In calculating a ten-percent reduction, the court is not unmindful of the fact that Nelson Mullins did not submit time sheets for some of its attorneys who worked briefly on the case and absorbed some costs and expenses that might have been billed to the client in a regular fee-producing case. The court appreciates Nelson Mullins' exercise of "billing judgment" in this regard.

| Attorney | Rates Out/In | Hours Out/In | Fees |
|---|---|---|---|
| J. Christopher Mills | $140/$140 | 2.8 | $ 392.00 |
| Rochelle L. Romosca | $100/$100 | 150.55 | $ 15,055.00 |
| TOTAL | | . | $323,509.50 |

| Non–Attorney | Rates | Hours | Fees |
|---|---|---|---|
| Tammie Pope** | $ 65 | 105.50 | $ 6,857.50 |
| Serena Malin** | $ 35 | 12.55 | $ 439.25 |
| Nicole Howland** | $ 35 | 6.45 | $ 225.75 |
| Leigh Thompson*** | $ 35 | 10.50 | $ 367.50 |
| Leigh Anne Wills*** | $ 35 | 8.0 | $ 280.00 |
| Less: | | | |
| 75% of project assistants' submissions | | | − $ 485.63 |
| | | | $ 7,684.37 |
| TOTAL | | | $331,193.87 |

\* law clerks

\*\* paralegals

\*\*\* project assistants

## NELSON, MULLINS, RILEY & SCARBOROUGH

| Attorney | Rates Out/In | Hours Out/In | Fees |
|---|---|---|---|
| Robert Meriwether | | | |
| 4/92–12/03/93 | $120.00 | 490.3 | $ 58,836.00 |
| 12/04/93–11/03/94 | $140.00 | 916.1 | $128,254.00 |
| 11/04/94–01/25/95 | $145.00 | 7.4 | $ 1,073.00 |
| Less: | | | |
| April 21, 1994 injunction hearing | $140.00 | 8.75 | − $ 1,225.00 |
| Coates Crewe testimony | $140.00 | 5.0 | − $ 700.00 |
| Phase II reduction | $140.00 | 122.8 | − $ 17,192.00 |
| Net: | | | $169,046.00 |
| | | | |
| Rochelle L. Romosca | $ 95.00 | 1313.6 | $124,792.00 |
| Less: | | | |
| April 21, 1994 injunction hearing | | 8.75 | − $ 831.25 |
| Coates Crewe testimony | | 5.0 | − $ 475.00 |
| Net: | | | $123,485.75 |
| | | | |
| Alice Harris | $ 95.00 | 1671.5 | $158,792.50 |
| Less: | | | |
| Coates Crewe testimony | | 5.0 | − $ 475.00 |
| Phase II reduction | | 169.9 | − $ 16,140.50 |
| Net: | | | $142,177.00 |
| | | | |
| Darryl Smalls | $120.00 | 44.3 | $ 5,316.00 |
| Brent Boyd | $ 95.00 | 136.6 | $ 12,977.00 |
| H. Metcalf–Dodson | $100.00 | 27.9 | $ 2,790.00 |
| R. Len Rowe | $100.00 | 55.2 | $ 5,520.00 |
| Dominic Starr | $ 95.00 | 98.8 | $ 9,386.00 |
| Carey Kilton | $120.00 | 35.2 | $ 4,224.00 |
| Catherine Cauthen | $ 95.00 | 85.0 | $ 8,075.00 |

| Attorney | Rates Out/In | Hours Out/In | Fees |
|---|---|---|---|
| Less: | | | |
| Phase II reduction | $ 95.00 | 2.3 | − $ 218.50 |
| Net: | | | $ 7,856.50 |
| | | | |
| Clif Scott | $120.00 | 253.5 | $ 30,420.00 |
| William Brown | $115.00 | 396.4 | $ 45,586.00 |
| Less: | | | |
| Coates Crewe testimony | | 5.0 | − $ 575.00 |
| Phase II reduction | | 38.9 | − $ 4,473.50 |
| Net: | | | $ 40,537.50 |
| | | | |
| | | | $553,735.75 |

| Non–Attorney | Rates | Hours | Fees |
|---|---|---|---|
| Catherine Boette* | | | |
| 4/92–6/93 | $ 70.00 | 375.5 | $ 26,285.00 |
| 11/93–1/95 | $ 75.00 | 904.3 | $ 67,822.50 |
| Less: | | | |
| Coates Crewe testimony | $ 75.00 | 5.0 | − $ 375.00 |
| Phase II reduction | | 48.2 | − $ 3,615.00 |
| Net: | | | $ 90,117.50 |
| | | | |
| Kim Lanier* | $ 55.00 | 57.5 | $ 3,162.50 |
| Suzanna Timor* | $ 60.00 | 70.6 | $ 4,236.00 |
| Jennifer Minick* | $ 60.00 | 85.0 | $ 5,100.00 |
| Ginger Boyt* | $ 70.00 | 79.6 | $ 5,572.00 |
| Kelli Stephens* | $ 70.00 | 663.3 | $ 46,431.00 |
| Less: | | | |
| Phase II reduction | | 38.0 | − $ 2,660.00 |
| Net: | | | $ 43,771.00 |
| | | | |
| Teri Wall* | $ 70.00 | 221.9 | $ 15,533.00 |
| Less: | | | |
| Coates Crewe testimony | | 5.0 | − $ 350.00 |
| Net: | | | $ 15,183.00 |
| | | | |
| Chip Ford** | $ 60.00 | 47.9 | $ 2,874.00 |
| Donna Barnes*** | $ 35.00 | 97.7 | $ 3,419.50 |
| Jennifer Minick*** | $ 35.00 | 401.4 | $ 14,049.00 |
| Less: | | | |
| Coates Crewe testimony | | 5.0 | − $ 175.00 |
| Net: | | | $ 13,874.00 |
| | | | |
| Cassandra Sturkie*** | $ 35.00 | 162.3 | $ 5,680.50 |
| Don Hampton*** | $ 35.00 | 142.3 | $ 4,980.50 |
| Margaret Boette*** | $ 35.00 | 252.6 | $ 8,841.00 |
| Shannon Willis*** | $ 35.00 | 197.7 | $ 6,919.50 |
| | | | $213,731.00 |
| | | | |
| TOTAL | | | $767,466.75 |
| | | | |
| Less: | | | |
| 75% of project assistants' submission | | | $ 32,786.25 |
| Net: | | | $734,680.50 |
| | | | |
| Less: | | | |
| 10% discount for duplication | | | $ 73,468.05 |

| Non–Attorney | Rates | Hours | Fees |
|---|---|---|---|
| Net to Nelson Mullins | | | $661,212.45 |

\* law clerks
\*\* paralegals
\*\*\* project

## S.C. PROTECTION AND ADVOCACY SYSTEM FOR THE HANDICAPPED, INC.

| Attorney | Rates Out/In | Hours Out/In | Fees |
|---|---|---|---|
| Nancy McCormick | $150.00 | 445.05 | $ 66,757.50 |
| Less: | | | |
|   Coates Crewe testimony | | 5.0 | − $ 750.00 |
|   Phase II reduction | | 47.0 | − $ 7,050.00 |
| Net: | | | $ 58,957.50 |
| | | | |
| Holly Walker | $105.00 | 145.10 | $ 15,235.50 |
| | | | $ 74,193.00 |

### TOTAL FEES AWARDED

| | |
|---|---|
| Total to Fairey Parise | $331,193.87 |
| Total to Nelson Mullins | $661,212.45 |
| Total to Protection & Advocacy | $ 74,193.00 |

---

The court has considered, but declines to make either an upward or downward adjustment to the lodestar figures above. *See Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Any possible basis for such an adjustment has been reflected in the lodestar; thus, no adjustment to the lodestar should be made. *See Cooper v. Utah,* 894 F.2d 1169, 1172 (10th Cir.1990); *Hughes v. Repko,* 578 F.2d 483, 487 (3d Cir.1978).

### IV

### COSTS AND EXPENSES

The prevailing plaintiff in a civil rights action is entitled under Section 1988 to recover " 'those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to the fee-paying client, in the course of providing legal services.' " *Spell v. McDaniel,* 852 F.2d 762, 771 (4th Cir.1988) (*quoting Northcross v. Bd. of Educ.,* 611 F.2d 624, 639 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980)).

Plaintiffs initially sought costs totaling $141,499.82. In their opposition memorandum, defendants interposed objections to certain costs, such as one first-class plane fare and expenses for meals consumed in the Columbia, South Carolina area prior to and during trial. Plaintiffs have responded by withdrawing all of the items to which defendants objected. After withdrawing these items, the revised costs totals are as follows:

| | |
|---|---|
| Fairey Parise | $ 8,021.25 |
| Nelson Mullins | $107,827.69 |
| Protection & Advocacy | $ 2,660.65 |

Upon receiving the revised request for costs and expenses, defendants have indicated that they have no remaining challenges to these items. *See* Letter of Frank S. Potts dated November 3, 1995.

### Conclusion

For the reasons stated above, plaintiffs' motion for an award of attorneys' fees and costs is granted as modified herein. Defendants are hereby ordered to pay plaintiffs their fees and costs reasonably incurred as follows:

Attorneys' Fees [14]

| Fairey Parise & Mills, P.A. | $331,193.87 |
| Nelson, Mullins, Riley & Scarborough | $661,212.45 |
| S.C. Protection & Advocacy Systems | $ 74,193.00 |

Costs and Expenses [15]

| Fairey Parise & Mills, P.A. | $ 8,021.25 |
| Nelson Mullins, Riley & Scarborough | $107,827.69 |
| S.C. Protection & Advocacy Systems | $ 2,660.65 |

IT IS SO ORDERED.

14. The court has reduced the attorneys' fee request by a total of $160,014.43, of which $33,446.88 was for project assistants.

15. Plaintiffs voluntarily reduced their cost request by $22,990.23.